1947 Henkel Corporation v. Proctor & Gamble Did we offend everybody? You didn't take a minute. Was it something we said? Yeah. May it please the court, may I start? Just wait one minute while we allow everybody to leave the courtroom. It's distracting. You don't see it, but for us it's distracting when all the coming's and going. All right. I think we're ready. You can begin. Thank you, Your Honor. The case basically turns on the question of appreciation by the P&G inventors of the critical limitation in the count that there be a compressed and a non-compressed region, and that in that detergent tablet containing those two regions, the compressed region dissolves faster than the non-compressed. Can I ask you to grab your appendix? I'm going to have you go to page A371. A371. I'll tell you, it's clear to me that the Board cites an awful lot of stuff that has nothing to do with this fact or its substantial evidence. But one thing it does cite is this January, on A371, this January 1997 report by Metzinger-Groom, which could arguably be the corroborative evidence. I think that this is the only thing I see that could even arguably be the corroborative evidence. As I look at this, why don't you tell me how, and I'll tell you, substantial evidence, big standard, mountain to overcome. Substantial evidence deference. When I look at this and I read in that first paragraph talking about the rate of delivery of new technologies, then you go down and you say the rate of delivery of Tergital, and then I think probably maybe the strongest part would be the number two under current status and the number two at the end of that sentence number two, which says slower release of NB base, which I know to be the non-compressed region, from the dimple versus regular tablets, which is, would that not be the compressed region? No. Why? Because they are talking here about agents that are contained in the non-compressed or melt or dimpled region of the tablet. None of their discussion here has to do with the compressed region. Remember, this whole concept, the dimpled tablet, was designed to address instability in certain highly reactive materials that couldn't stand the pressure of being compressed. So they put them into the dimpled or the melt region, the non-compressed region. What they are talking about here is enhancing or slowing the activity, or excuse me, the release of actives, which you can argue I suppose is dissolution, in the non-compressed region. But they say nothing about the compressed region. Isn't the basis of comparison the regular tablet, which is, as I understand it, a tablet which is compressed? I don't believe they specifically relate it to the compressed tablet, but they don't give a numerical range for the dissolution rate in the compressed tablet. But that's not required. Yeah, we didn't require that of your inventor the last time this was here. Because of there being no numerical ranges anywhere in the documents, you can't compare when they're talking slower and faster with regard to the non-compressed region, you can't compare with the dissolution rate of the compressed region because you don't know what it is. Well, what is it that the release of NB base is compared against in this document? It's against the release of the other material that's in there for carotenoid stain removal performance. So they're talking about adjusting the melting point or the release point of the active in the non-compressed region, but they are not comparing it to the compressed region. And that's the major problem that P&G has here. Because the count requires that the relationship, the comparative relationship, be between the compressed and the non-compressed region. But regular tablets are all entirely compressed. They are. So why isn't this a comparison in terms of release between non-compressed, i.e. the stuff in the dimple, and compressed, that is what regular tablets are made up of? Because I believe what they're talking about here is the release from the non-compressed or the melt region. They are not. Here's the problem. Even if I agree with you, it's still substantial evidence. And can't this document arguably be read both ways? I would submit it cannot, Your Honor. Let's go perhaps to the next page, the 372 and 373. This is the affidavit or declaration, the testimony of Menster Group. This is one place where the Board repeatedly referred to as saying this demonstrates an observation of the relative disillusion rates. And if you look at this declaration, the only thing that Menster Group says she determined by test was the fact that this tablet had an effect in removing carotenoid stains. Now, you can remove carotenoid stains without addressing relative disillusion rate of compressed and non-compressed. And indeed, if you think about it, you put a tablet in a washing machine that has arguably compressed and non-compressed. It comes out at the end of the cycle. The stain is removed. The tablet's gone. You have not been able to observe. And certainly, Menster Group doesn't say in her declaration that she did. And certainly, there's no document that says she did and records a relative disillusion rate. So what the Board said repeatedly was that... She identifies and acknowledges that there's a slower release of non-compressed from the dimple. Yes, slower than another use of PGE, polyethylene glycol, of a different molecular weight that would release it faster or slower. But that's release from the non-compressed. It's not the comparison that is required by the count. But the versus. That's why I don't understand how you're changing the direction. I really want to understand this. It's a slower release of MB base from the dimple versus. I mean, I don't see how that's not compared to regular tablets. No, no. Slower release from the melt. In other words, they put together a melt with a certain molecular weight of polyethylene glycol so that it melted at a particular temperature. And therefore, it released it. Wait, wait, wait. Hold on. I definitely agree with you. A lot of the documents the Board pointed to, when I went to them, it seemed to be talking about the timing of the dissolution rather than the rate of dissolution. And it suggested to me that they had the focus entirely wrong. But this one does talk repeatedly about the rate of delivery. And rate is different from timing. I agree with you on all the other documents. That's why I'm not even going to ask a question about any of the others. But this is the one that's causing me to pause. And I wish I could review it de novo. But I can't. Let's assume I have a compressed region and a non-compressed region. Now, I don't say anything about the dissolution rate in this document or any other document about the compressed region. Now I'm addressing an ingredient in the non-compressed or melt region. I make up a tablet. I run it through. I determine carotenoid stains. That doesn't tell me which one dissolved first, which was faster, which was slower. Now I get a result. Now I'm contemplating how to get a better result. So now I am talking about increasing the rate of dissolution, if you will, of that particular active from the non-compressed region. I haven't said anything about how it relates to the compressed region. But what is, again, I know Judge Moore has raised this several times, what does versus regular tablets mean? Versus if you had a regular tablet with no compressed or melt region. But the fact of the compressed or melt region does change the dissolution rate of the overall tablet. So they're talking overall tablet and not a compressed region and a non-compressed region. That's the problem. But they're not in the first. I'm sorry, are we on the report now? We're still in the same spot. This entire argument is going to probably be over these ten words. So slower release of NB base from dimple. That's not looking at how quickly does this entire tablet. How fast, I agree with you. It's just how quickly does the release of the NB base, i.e. the non-compressed part, come. And slower has to be relative to something. Relative to what it was in this particular tablet when they ran it because they're common. But no, but slower has to be relative to something. And they tell you what it is because they say versus. Slower as compared to regular tablets, which we all agree are completely entirely compressed. Yes, but not that doesn't have two regions in it. And we're talking here about a two-region tablet. So you're saying that the reason that this document doesn't support the board's decision is because the comparison is between a tablet that has a non-compressed tablet versus a compressed tablet. In part. As opposed to a comparison of dissolution rates of two regions in a single tablet. That is one of the points that I am making, Your Honor, yes. But I submit that properly interpreted in the context of all of the documents and the testimony of Meissner-Broom, when she is talking about increasing or adjusting the rate of delivery of actives from the melt, she is talking about increasing it in the melt. But that doesn't tell you anything about the performance of the compressed part of that tablet. And it is the relative dissolution rate in a two-region tablet between the compressed and the non-compressed and the requirement that the compressed dissolve faster that is the key to the interference count requirement. So merely saying that I'm going to improve the rate of release of the active from the melt, I'm going to have it go faster or slower compared to what it was when I used a lower molecular weight polyethylene glycol doesn't tell me whether that new rate is faster or slower or the original rate was faster or slower than the compressed region. So the focus has to stay on the requirement of the count that the comparison is of the compressed region to the non-compressed region in a two-region tablet. And if you look at all of the documents that we have here, including the ones after this, we look at, for example, the provisional application, setting it forth very clearly, very clear terms. Those are not here. If Meisner-Groom had observed a tablet that had a differential dissolution rate, she would have said it in this declaration. She doesn't. All she says is I tested for carotenoid stain removal. And you can test for carotenoid stain removal without observing or even knowing or caring or being motivated to care about the relative dissolution rate of the compressed versus the non-compressed. So the key, and I think where the board went off, and they repeatedly referred to Meisner-Groom and her testimony. They even said that that testimony in this document that we spent so much time on showed that she had observed the difference between the compressed and the non-compressed. And that's simply not true. The board went out of its way in several different places to refer to Meisner-Groom at A14, 37, 57, 60, and 69, and they've simply misread what she said or they have lost sight of what it is that the comparison should be. The comparison is between a region that is compressed in a single tablet with a region that is non-compressed in that same tablet, and the requirement is comparative or relative. The compressed region must go faster. Talking about releases from the non-compressed and adjusting that without telling you how either the original rate or the new rate relates to the compressed region in that same tablet does not tell you what the comparative rate is. Okay, fine. We get your point. Let's hear from your opponent. We're into your rebuttal, but we'll give you some additional time if you need it. Thank you. Mr. Charles, good morning. May it please the court, P&G submits that the board's findings are supported by substantial evidence. The evidence as presented by P&G we feel tells a straightforward story about the making of the tablet. Do you agree with the other side that what you need is one tablet with a compressed and a non-compressed region in that tablet and comparing the rates, that that would be necessary, and you've satisfied that, or do you think something else is allowed? What we believe is that if we go and look at the decision rendered in Hinkle, P&G, the first go-around, this court decided that the correct requirement of the court calls for a showing of appreciation by the inventor simply that the dilution rate of the compressed region is greater than the dissolution rate of the non-compressed region. Further, this- So do you read that as saying we are looking at one tablet that has a compressed and a non-compressed region and you have to compare the dissolution rates between those two? Do you think that's a fair characterization? I read this such that the determination has to be made that there's a compressed region and a non-compressed region. The compressed region dissolving faster than the non-compressed region. That's the read that I gather based on, again, Hinkle v. P&G 1, the first decision made by this board. Does that require some evidence of a single tablet with dual regions, or is it sufficient that there is some evidence to show the two materials in question, albeit in different tablets, have a different dissolution rate? Well, in the first go-around with Hinkle v. P&G, P&G proffered that a number of single-variable tests, which this court did not agree with, saying we talked about doing a comparison where you had the two materials individually. We talked about the effects that temperature may have. We talked about the effects of surface area. And this court got us back to one just has the compressed region just has to have a dissolution rate that's less than a non-compressed region. The non-compressed region, I'm sorry, the compressed region has to dissolve faster than the non-compressed region. And this court continuously got us back to that particular point. So that's the construction by which we're making. But what's your answer to Judge Lynn's question, which I tried to ask myself? So are you saying that you can compare one tablet to another tablet or do you have to be dealing with a non-compressed and compressed region within one tablet? I think that you can, if you're talking about compressed portions of the same type of tablet, I think if you're comparing the materials, I think you can make that comparison. You know, I know that there's been a concentration. You can make the comparison with separate tablets as opposed to, you don't necessarily need a single tablet with two regions. Is that what you're saying? Well, I think that we're not limited in that regard. I think that the interpretation that I made of this court's previous ruling was that these constructs were not necessary. The important thing was that the compressed region dissolved faster than the non-compressed region per the count. In a single tablet though, I mean, the whole claim is focused on a single tablet that has two regions. I mean, that's the only thing at issue here. That's the only thing that you make. It's always only been about a single tablet with two regions. It hasn't been about comparing two discrete tablets against each other, right? That's correct. So wouldn't the appreciation have to come in the form of comparing the compressed to the non-compressed within that single tablet? Well, I think in the case here, and I think what we're talking about is the Messger-Groom monthly report. But no, I don't want to – to show appreciation of compressed dissolving faster than non-compressed in a single tablet, you'd have to actually show appreciation of it occurring in a single tablet, wouldn't you? Well, I think what we have here, we have people that have a mastery of how these things do and do not dissolve. McGregor, for instance, talks at length about how – Is your answer no or yes? Because I think I'm just trying to ask the same question that actually I think everybody's asked, and we don't get – we're not getting an answer from you. So what I'm trying to understand is does the appreciation have to come from comparing compressed and non-compressed regions in a single tablet? It does not have to come from that. And what is your position of what this Messger-Groom report discloses, a comparison within a single tablet or a comparison as between two different tablets? The position that we have is that the comparison has to do with the non-compressed portion and its release rate with two similarly made compressed portions. The non-compressed portion of one tablet was attached to the compressed portion, and then it was compared to another compressed portion. And that you're getting from just those words that Judge Moore has been talking about after number two? Yes, Your Honor. Again, this calls out a slower release rate of the NB base from the dimple versus regular tablets. Again, having these compressed portions that dissolve really, really fast that we've done work on, that were outlined in the monthly reports that all – And that's when you say regular tablets? That's what you're reading into regular tablets, that that's compressed portions that release really quickly? Yes. The work that was done initially by P&G in the earlier monthlies was to develop a compressed portion that dissolved really, really quickly. Getting to this point was an evolutionary step. We worked through getting a compressed region that would dissolve really quickly and then recognized that there was an additional problem that we wanted to fix by incorporating a non-compressed region with things that could not be tabulated. Did the inventor really appreciate, though, this slower release of non-compressed or faster release of compressed? I say that because when you look down a little further at the next steps, it seems clear to me that the objective that they are attempting to realize is we will aim to achieve quickest possible release of NB base from tablet. That to me seems like they're saying we want to speed up the release of the non-compressed, which is kind of the exact opposite of what's ultimately claimed. I'm a little confused about what they may or may not have appreciated. At this point in the development, I think what we have here is we're getting into the fine-tuning stage. The inventors here have a mastery and can make these things release at various points, make different actives release at various points in the tablet, whether we want to release something at the beginning of the wash phase or at the end of the wash phase. If we're looking at the ROI, the record of invention by McGregor, in example three, there is a tablet that's disclosed whereby we want to delay the bleach addition until later in the wash cycle. A peg was developed such that we were able to accomplish that so that you have the really fast dissolution of the compressed portion to release the surfactant phase for cleaning and then the release of the non-compressed portion having the grease cleaning capabilities later in the wash where they'll be more apt to optimally work within the scope of the dishwashing machine. This brings up a question that's been rolling around in my mind. Throughout all of these papers here, there's a lot of discussion about adjusting the PEG component and that would adjust the melting point and that would in turn affect the time at which something might release because as the temperature increases during the washing cycle, then at some point it melts. So it looks to me like the whole focus here was in adjusting the time of release or the temperature of release, but yet there is discussion that may be just sloppy language about referring to that as slower or faster. So I'm left with the question, did anybody really appreciate and was anybody even remotely concerned about dissolution rates or was the focus just in terms of what gets released when, at what temperature, which is not a dissolution rate issue, it's a timing or temperature issue. When this court addressed dissolution rate, they looked to the specification that we wrote. They also looked to the specification that Hinkle wrote, saying that the specification read that the difference in rate of dissolution means that components of the compressed and non-compressed portions can be delivered to the wash water at different points in the washing or rinsing cycle of the washing machine. The language that we use in the ROI is very close to that, saying that particular raw materials can be delivered into the wash at specific time temperature in the wash cycle so as to maximize performance potential. The issue that we get with dissolution rate is about where we want to distribute actives in the wash cycle. This is why we had in the compressed region a really fast-dissolving compressed region, which we had monthly showing how we developed something that would start dissolving almost instantly. In a non-compressed region, that was for dissolving at a point later, after reaching a certain temperature. And then further, the demonstration that the non-compressed region can be manipulated by adjusting the molecular weight of PEG to determine where in the process we want to deliver the particular actives that are in the non-compressed region. So that suggests that all of the focus was on the timing, when, not the rate. And the rate is what needed to be appreciated. I think that the rate is appreciated in that what we have is a dissolution. We speak to the actual dissolution rate and faster dissolving of the compressed portion in the earlier monthlies as well as the ROI. No, no, no. All of those things talk about faster dissolving, not faster in terms of how long it takes to dissolve from when it starts to when it finishes, but earlier in the cycle dissolving. Every one of them does. It's all about timing. It's never about rate. Well, getting to what we talk about in the specification, it becomes, as we define dissolution rate, what we talk about, again, based on the specification, is where it's delivered in the wash cycle. That's not how we defined it last time the case was here. What you just said is the crux of the problem with the evidence that was presented. Because our definition for claim construction purposes, for appreciation purposes, in our opinion, was clearly the rate of dissolution. And that is consistent with the claim language. And all the evidence you're pointing to and what you're telling us now is we show timing is important. It's better that it do it faster in the cycle, earlier in the cycle, but not that it dissolve more quickly from start to finish when it starts dissolving. But I think that the issue that we're facing here is, as these things are in the wash beginning to dissolve, their being able to dissolve earlier or later is based specifically on the dissolution rate that the materials have. If you have something that starts to dissolve immediately, then the scientists that we have here know that that, in fact, has a higher dissolution rate. I didn't see any evidence in the record anywhere to that statement. That would be a critical statement if you had tied that in. But I don't see the record evidence to support it, so I don't see how you could say there's substantial evidence. I don't see anybody, whoever testified, that when we move up timing, everyone skilled in the art understands that results in quicker dissolving. Well, I think that the earlier monthly reports were trying to drive home that you could dissolve these compressed portions faster and faster. Earlier in the cycle. Initially, they spoke about, I think, just increasing the speed by which they will dissolve. That's where the monthly report started from. The reason that we pre-hydrated the phosphates there was to get this to dissolve almost immediately, which, again, it wasn't written in terms of the language of the count, but the substance is there as far as being able to get this to dissolve faster. The Metzger-Groom report does refer to the rate of delivery in the upper portion of the report. I guess that goes to the point you're trying to make, correct? Yes. Yes, it does go to that. It's not just timing. Yes, there is a time component, but it's not just timing. These people recognized that the compressed portion, we could get this to dissolve as fast as possible, which inherently meant that it had a higher dissolution rate, whereas the non-compressed portion was dissolving later in the point because it was dissolving at a slower dissolution rate. That is what they were getting at here. Thank you. Thank you very much. Mr. Hutz, in this detergent case, you're in the enviable clean-up position. Thank you, Your Honor. If I could refer the Court to the patent of P&G that's involved in the interference at A198, and specifically at Column 3, there's been a suggestion that when a particular region starts to dissolve, it's somehow definitive of the dissolution rate as is required by the count in interference. But I would like to point out that beginning at Column 3, Line 7, we have first the discussion of the compressed portion, and specifically at Line 13, it says, the compressed portion will begin to dissolve immediately on contact with water. Well, that's fine. The next paragraph talks about the non-compressed region, and at Line 23, it says, the non-compressed portion also begins to dissolve on contact with water. So the initiation of the dissolving is not definitive of what the dissolution rate is. What is definitive here is the count and how it defines the relative comparison dissolution rate of those two regions. It requires that to occur in a tablet. If you have a one-region tablet, compressed or non-compressed, you have different amount of surface exposed, for example, to the wash water, and it will dissolve at a different rate than that same region in a two-region tablet whose surface is blocked by some of the non-compressed or the melt region. This is why you have to have the comparison to meet the count and the appreciation to meet the count, which must be of the two-region tablet. What Judge Moore was referring to, what I tried to articulate before, was that when they're talking in the Meister-Groom monthly report about different rates, they are comparing release rates from one melt or dimple portion with the release rate of the same agent from another non-compressed or melt region. They are not relating it to the compressed region in a two-region tablet. How do you know that? Because that seems important to me. So where are you getting that concept from? Because it says slower release of NB base from the dimple, NB base is the non-compressed, versus regular tablets. I thought I understood regular tablets to be entirely compressed. You are correct in that respect. On that issue, my point there is that the compressed one-region tablet doesn't have the same surface exposure and other dynamics that it does if it's a two-region tablet with two, one compressed, one non-compressed. The other one I was addressing is where they talk about increasing or decreasing the rate of release, if you will, of the actives from the melt, and they do have several documents where they are comparing the release rate of actives from the dimple or the non-melt region. I could point out something else. Your Honor mentioned melting. Melting isn't necessarily dissolving. I could have candle wax and melt it, and it would release an agent, but it wouldn't be dissolved in the wash water. So melting and release are not identical, as has been mentioned by one or more of the Court. Again, the count is definitive as to what the relationship has to be. It is a comparative relationship between the compressed and the non-compressed in a two-region tablet, and there is simply no substantial evidence, and in particular the Meissner-Groom evidence that the Board relied upon. We would urge that there is no substantial evidence to support the ruling by the Board, and we ask this Court to reverse. Thank you very much. Thank both counsel. The case is submitted. That concludes our arguments for this morning. All rise.